## Commonwealth v. McDonald

*John H. Maurer*, assistant district attorney, and *James Francis Ryan*, assistant city solicitor, for Commonwealth.

*Philip Sterling*, for defendant.

BROWN, JR., J., April 13, 1938.—This is an appeal from a summary conviction before a magistrate for a violation of the Act of April 22, 1794, 3 Sm. 177, 18 PS §1991, which prohibits the performance of any worldly employment or business on Sunday.

Defendant was the managing director of an exhibition called the Philadelphia National Home Show, which was conducted in the Exhibition Hall of the Commercial Museum, 34th and Vintage Streets, Philadelphia, from February 18 to February 26, 1938. As stated by defendant: "The object of the home show was to stimulate an interest in home purchasing and home modernization, and home improvements of various sorts, and to do that by two means, first by education, and secondly by commercial exhibits."

Approximately one third of the floor space was devoted to educational exhibits, and the rest was occupied by displays belonging to manufacturers and retailers of products and merchandise to be used in the construction and decoration of homes. There were also three rooms in which moving pictures were shown. One was a room having a capacity of about 10 people, and in there pictures showing the various fire hazards to which a building is subject were exhibited continuously. Another was a room having a capacity of about 200 persons, and the subject of the pictures shown there was the testing of merchandise for quality. Apparently the purpose of this exhibit

was the advertisement of a local department store, for the patrons were informed by signs on the walls that all the goods shown in the picture could be purchased at that particular store. The third room in which motion pictures were shown was the largest of the three. It had seating arrangements for about 500 people and was called the Dream Home Theatre. Films were shown there three times a day, once in the afternoon and twice in the evening, depicting building activities in Philadelphia. There was charged a fee of 25 cents a person for admission to the show as a whole, that is, a payment of 25 cents entitled the payer to see both the ordinary exhibits and the moving pictures.

On the single Sunday, February 20, 1938, during which the show remained open, there were several alleged changes made in its operation. The attendants at the commercial exhibits did not take orders for merchandise as they did on weekdays, and the fee of 25 cents was charged for admission to the moving pictures only, no charge being made for admission to the other exhibits. There is no doubt that no orders were taken that day, but there is doubt that the charge was for the moving pictures only.

Obviously it was defendant's intention to bring the operation of the show within the terms of the Act of July 2, 1935, P. L. 599, 18 PS §2010m, which amends the Act of 1794, to permit the showing of motion pictures on Sundays after 2 p.m., if a majority of the electors in the municipality so desire. Since a majority of the electors in Philadelphia voted affirmatively on this question in the municipal election of 1935, it is no longer unlawful to conduct moving picture exhibitions in Philadelphia after 2 p.m. on Sundays.

Most of the testimony produced by the Commonwealth at the hearing was directed toward showing that the fee charged on Sunday was for admission to the regular exhibits as well as the motion pictures. Of course, if such

was the case, defendant was undoubtedly violating the prohibition against the performance of worldly business, since the collection of a compulsory fee, even though the exhibition itself is spiritual, is worldly employment or business: Commonwealth v. Weidner, 4 Pa. C. C. 437; Commonwealth ex rel. v. Sesqui-Centennial Exhibition Assn., 8 D. & C. 77. However, there is no need to review the testimony for the purpose of determining whether the admission fee to the motion pictures was a subterfuge since the conviction can be sustained on a much broader ground.

Section 1 of the Act of 1794, supra, provides in part:

". . . if any person shall do or perform any worldly employment or business whatsoever on the Lord's Day, commonly called Sunday (works of necessity and charity only excepted) . . . every such person, so offending, shall, for every such offense, forfeit and pay four dollars, to be levied by distress".

In Commonwealth ex rel. v. American Baseball Club of Phila., 290 Pa. 136, it was stated, at page 141: "The word 'worldly' as here used means 'concerned with the enjoyments of this present existence, secular,' 'not religious, spiritual or holy,'" See also Commonwealth v. Nesbit, 34 Pa. 398, 409. If worldly is contrasted with spiritual, in accordance with these decisions, it is obvious that the operation of this show was the performance of worldly business. The corporate purposes of the Sesqui-Centennial Exhibition Association were the meritorious ones of " 'exhibiting artistic, mechanical, agricultural and horticultural products and providing public instruction in the arts and sciences, thereby celebrating the one hundred fiftieth anniversary of the signing of the Declaration of Independence' ", and yet it was held that since none of the purposes was spiritual, the exhibition was worldly, and, therefore, should not be conducted on Sundays: Commonwealth ex rel. v. Sesqui-Centennial Exhibition Assn., supra, pp. 84-85.

The purpose of the Home Show was to stimulate an interest in home buying, building and decorating, worthwhile objects, yet not by any possibility spiritual. Furthermore, a part of the activity that took place there on Sunday was not only worldly but even commercial in the broadest sense of that word. From defendant's own testimony it is apparent that at least half of the floor space was taken up with exhibits by manufacturers and retailers of merchandise to be used in the construction and furnishing of homes. There were attendants at each of these booths, and these attendants explained and praised the products of their employers. True, on Sunday they took no actual orders and made no actual sales, but they did lay the groundwork for future sales. There can be no doubt that capturing and stimulating public interest and obtaining the names and addresses or possible customers are fundamental and indispensable steps in the business of selling. Consequently this is the type of worldly employment that is banned by the Act of 1794.

The situation is much like that presented in the case of Commonwealth v. Coleman, 60 Pa. Superior Ct. 380, where the conviction of the president of a professional baseball club, who permitted his team to play a free exhibition game on Sunday, was sustained. Of course, the conviction was based on that part of the act which expressly prohibits engaging in a sport on Sunday, but the court added, at page 386: "It is not charged that this defendant was engaged in a worldly employment or business, but it is a reasonable and fair inference to hold that these professional, salaried players, in giving an exhibition of their skill on Sunday without charge to 6,000 persons, were affording them such a diversion as would excite an interest in the sport so as to induce attendance at the games on week days when an admission fee would be charged." In the present case the exhibitors were exciting an interest in their products which they would capitalize in the future by making sales.

Since the act excepts from its prohibition works of charity and necessity, it remains only to be seen if the Home Show falls within either of those two classifications.

The reasons which have been set forth for holding that the exhibition, as it was conducted on Sunday, was a worldly enterprise are equally conclusive when used to show that it was not charitable. Certainly, the exhibits by State and municipal agencies were charitable, in that the agencies expected no pecuniary return from them, but, on the other hand, the commercial exhibitors were there, as already stated, for the purpose of increasing their sales.

The leading case on the definition of the word "charity", as it is used in Sunday laws, is Doyle v. Lynn & Boston R. R. Co., 118 Mass. 195. It is there defined, at page 197, as "everything which proceeds from a sense of moral duty, or a feeling of kindness and humanity, and is intended wholly for the purpose of the relief or comfort of another, and not for one's own benefit or pleasure." Our Supreme Court has said: "It is a giving for the love of God or the love of a neighbor in a broad catholic sense": Dale, Trustee, v. Knepp, 98 Pa. 389, 393. And in Commonwealth ex rel. v. Sesqui-Centennial Exhibition Assn., supra, where the question is considered at length (on pp. 85-86) it is likewise defined as an absence of self-interest.

Clearly the purpose of the commercial exhibitors was not so altruistic as would cause their demonstrations and displays to fall within the above definitions. The guilt or innocence of defendant, who was the manager of the whole exhibition, is determined by the character of the activity of the individual exhibitors. However, that is by no means unjust, because the commercial exhibits, as has been said, composed at least one half of the complete exhibition.

Nor can any one of these exhibits be said to be a "necessity" as that word is used in the act. Defendant has laid considerable stress upon the fact that the various dis-

plays, even the commercial ones, were educational, and that education is a necessity. However, the question is not whether education in home building is necessary, but whether it is so necessary that it must be engaged in on Sunday. The answer to that is, of course, obvious. It is a convenience only.

The Sunday newspaper with its special features and news of local and international events is educational, yet the Supreme Court has said concerning it: "While the Sunday newspaper may be of a great convenience to a large portion, perhaps a large majority of the people, it does not in our opinion come within the exceptions of the act of 1794. No one pretends that it is a charity, and we cannot say as a matter of law that it is a necessity. It is a convenience, nothing more": Commonwealth v. Matthews, 152 Pa. 166, 169.

Undoubtedly the word "necessity" has a flexible meaning, broadening and narrowing according to the wants, needs, and customs of a particular community at a particular time: Commonwealth ex rel. v. Smith et al., etc., 28 Dist. R. 638; Commonwealth v. Shipley et al., 18 Dist. R. 133. "The law regards that as necessary, which the common sense of the country, in its ordinary modes of doing its business, regards as necessary": Commonwealth v. Nesbit, supra, 409. However, to hold, as a matter of law, that it is necessary at this time and in this community for merchants to display and demonstrate their wares on Sundays, even though, by so doing, a portion of the public receives education in home building, would not be justified.

The personal views of the court as to the present religious and social value of the Act of 1794 have no place in the determination of the issue presented, for it is the duty of the court "to construe the statute so as to accomplish its purpose, which was to enforce an *observance* of Sunday, instead of *obliterating* it": Johnston v. The Commonwealth, 22 Pa. 102, 110. Nor is the court con-

cerned with the allegation of defendant that there are violations of the act which go unpunished. That is a matter for the police authorities in the first instance. If presented for the purpose of showing that the public standards of religious observance of Sunday have changed, the appeal has been made to the wrong tribunal. Only the legislature may properly abolish or modify the prohibitions contained in the act.

Defendant is, therefore, adjudged and found guilty of the violation of section 1 of the Act of April 22, 1794, 3 Sm. L. 177, and it is ordered that he shall forfeit and pay the sum of $4, together with costs of prosecution, to be levied by distress, and if he shall refuse or neglect to pay the said sum, or goods and chattels cannot be found, whereof to levy the same by distress, he shall be and is hereby directed to be committed to and imprisoned in the House of Correction for six days.